In re Sheldon GURST, Debtor.

**PHILADELPHIA CONSUMER DISCOUNT COMPANY,**
Plaintiff,

v.

**Sheldon GURST, Margot Gurst, Harvey Gurst, Kimberly Gurst, Defendants.**

**Sheldon GURST, Plaintiff,**

v.

**PHILADELPHIA CONSUMER DISCOUNT COMPANY,**
Defendant.

Bankruptcy No. 86–04726K.
Adv. Nos. 86–1150S, 87–0277S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 20, 1987.

---

Irwin Trauss, Community Legal Services, Inc., Philadelphia, Pa., for debtor.

Martin N. Ghen, Doylestown, Pa., for Philadelphia Consumer Discount Co.

Edward Sparkman, Philadelphia, Pa., trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

Approximately five months ago we issued an Opinion addressing this Adversary proceeding and other related matters involving this Debtor, reported at 75 B.R. 575 (Bankr.E.D.Pa.1987). There, we attempted to set forth a logical procedural progression which would ultimately allow us to resolve all of the matters addressed therein. As we expected, the decision of this Adversary proceeding, which is undertaken herein, allows us to resolve all of these matters and to thus hopefully bring near a close the rather excessive measure of the disputes raised by the Debtor in this case and the Debtor's spouse Margot in a companion case, Bankr. No. 85–00480K, on one hand, and the Defendant in this Adversary case, PHILADELPHIA CONSUMER DISCOUNT COMPANY (hereinafter "the Creditor"), on the other.

In our recent decisions in *In re Jones, Jones v. Mid–Penn Consumer Discount Co.*, 79 B.R. 233 (Bankr.E.D.Pa.1987); *In re Melvin*, 75 B.R. 952 (Bankr.E.D.Pa. 1987); and *In re Tucker*, 74 B.R. 923 (Bankr.E.D.Pa.1987), we directly addressed several of the parties' claims and ultimately reached results there in matters featuring, like the instant proceeding, claims by consumer-debtors that they are entitled to rescind loan transactions pursuant to the federal Truth-in-Lending Act, 15 U.S.C. § 1601, et seq. (hereinafter referred to as "the TILA"), several of which have been inter-related with applicable state law. Similar to our conclusions there, we hold, here, as follows: (1) The Debtor does indeed have a right to rescind both transactions in issue, due to the Creditor's premature disbursements of the loan proceeds in one transaction and seriously defective disclosures of security interests taken by the Creditor in the other; (2) The Debtor's usury claim, based upon interpretation of a provision of the Pennsylvania Consumer Discount Company Act, 7 P.S. § 6201, et seq. (hereinafter referred to as "the

CDCA"), as in *Jones* and *Tucker,* must be rejected; (3) The Creditor, by refusing to acknowledge the Debtor's valid rescission, not only suffers a loss of its security but, given the prayers for relief, facts, and equities present in this case, its entire Claim; and (4) The Debtor is also entitled to statutory damages in light of the Creditor's failure to acknowledge the rescission and the Creditor's failure to plead an applicable statute of limitations defense.

We refer the reader to our past Gurst family installment appearing in the Opinion at 75 B.R. 575 for the procedural history of the Adversary proceeding before us through June 30, 1987.[1] True to our Order, we conducted the trial of this matter in two segments on July 8, 1987. As it developed, the parties could not attain a Stipulation of Facts, but rather expended well over an hour of court time gathering together seventy-nine Exhibits. Testimony was adduced from the Debtor, his wife Margot, their son Harvey, and, called as a witness by both parties, Lewis Peters, the Creditor's long-time office manager and presently its Vice President.

At the close of the hearing, we allowed both parties an extension of the July 24, 1987, deadline for post-trial briefing, until July 25, 1987, and August 7, 1987, for the Debtor and the Creditor, respectively. Two pleas for extensions later, we granted what we expressly stated would be a last revision of our schedule to allow the Debtor until September 30, 1987, to file an Opening Brief; the Creditor, until October 31, 1987, to file its Brief; and the Debtor until November 16, 1987, to file a Reply Brief. Nevertheless, the parties unsuccessfully attempted one further effort at extending even those deadlines.

The inability of the parties to reach a Stipulation of Facts obliges us to render our decision in the form of Findings of Fact, Conclusions of Law, and a Discussion. We shall attempt to confine ourselves to addressing only those facts relevant to the ultimately-decisive issues rather than the multitude presented in the complete record.

## B. FINDINGS OF FACT

1. The Debtor and his wife Margot (hereinafter referred to as "the Gursts") entered into the initial potentially relevant transaction with the Creditor on August 26, 1977, at which time they paid off a loan to another loan company of $2,147.11 and borrowed an additional $1,490.24, resulting in a total indebtedness (including pre-paid-finance charges) of $6,000.00, secured by a mortgage on their residence at 11732 Millbrook Road, Philadelphia, Pennsylvania 19154 (hereinafter "the Home").

2. This initial loan was refinanced four times, the final transaction in this stream occurring on August 25, 1982. In each transaction, the Creditor took a mortgage against the Home as security.

3. On March 28, 1978, the Gursts' son Harvey made a loan from the Creditor to purchase a 1974 Chevrolet automobile in the net amount of $2,523.60. This loan, the total indebtedness in which was $3,816.00, was secured by the auto, and, having been co-signed by the Gursts, was further se-

---

1. We note that the disputes in Margot's case are winding down, but apparently are still not completely at rest. Our Opinion sustaining the Creditor's Objection to the Proof of Claim filed by Margot on the Creditor's behalf pursuant to 11 U.S.C. § 501(c) in the sum of one ($.01) cent, reported at 70 B.R. 467 (Bankr.E.D.Pa.1987), was recently affirmed by the District Court, 80 B.R. 27 (E.D.Pa.1987).

Our later Opinion, dismissing the Creditor's Objections to Confirmation, but requiring Margot to amend her Plan, reported at 76 B.R. 985 (Bankr.E.D.Pa.1987), is also on appeal. We note that Margot did amend her Plan and it was confirmed on August 12, 1987.

We observe, as we anticipated in our last Opinion involving the instant Debtor, 75 B.R. at 576 n. 2, 579 n. 5, that our decision here resolves not only all of the issues addressed in that Opinion, but most of the matters involving the Gurst family. Since we hold that the Creditor has no claim against the instant Debtor, we would clearly have ruled likewise in the case of Margot. This eliminates any concern over the Debtor's § 501(c) filing or the Creditor's standing to object to confirmation of Margot's Plan.

We cannot commend either attorney involved in these matters for taking us on such a circuitous path to this result.

cured by an additional mortgage on the Home.

4. This loan was refinanced on two occasions, the final transaction in this stream occurring on August 23, 1982. In the first refinancing transaction, Harvey's wife Kimberly was a co-borrower, the Gursts were co-signers, and security was taken in the 1974 Chevrolet, a 1977 Ford automobile titled to Kimberly's father but utilized by her, and the Home.

5. The Security Agreement executed in the last transaction in this stream, in which Kimberly and the Gursts were also parties, recited that the only security taken was a mortgage in the Home. *But see* Finding of Fact 13 *infra*. However, the Creditor retained encumbrances on both autos until the Creditor's assignee gave Harvey the title to the Chevrolet immediately prior to its being junked subsequent to this loan. The encumbrance remains on the Ford to this day.

6. The benefit, use, and advantage of the proceeds of each of the loans involving Harvey were derived solely by Harvey and/or his wife and not by the Gursts, and the Creditor had no reason to know that the Gursts would receive any benefit, use, or advantage therefrom.

7. Since a security interest was taken in the Home in each of the eight transactions in both streams, the Creditor was obliged to give the borrowers a notice of their right to rescind each transaction.

8. On August 23, 1982, the same date of the last transaction including them, Harvey and Kimberly were given two checks, one in the amount of the balance on the prior loan, $4,526.38, which they endorsed and was negotiated the next day, prior to the rescission date, August 26, 1982; and the other in the amount of new proceeds in this loan, $313.87, which was not negotiated until August 30, 1987.

9. On August 25, 1982, the same date as the last transaction in the stream involving them alone, the Gursts were given a check in the amount of the new proceeds given to them in the loan, $762.54, which they endorsed and negotiated the same day, prior to the rescission date, August 30,

1982. Furthermore, the Mortgage itself includes stampings indicating that it was filed at 9:25 A.M. on August 30, 1982, prior to the expiration of the rescission period.

10. Given the documentary support for same, we totally credit the testimony of Margot Gurst that, in the transaction involving them alone, the loan proceeds were disbursed to the Gursts immediately. We find that the documents rebut any denials of Mr. Peters on this score.

11. However, the documentary support in the transaction involving Harvey is ambiguous—the new proceeds were not disbursed until after the rescission date. The testimony of Mrs. Gurst does not appear to relate to this loan, and, in light of Mr. Peters' testimony to the contrary, we do not find that the loan proceeds were disbursed prematurely in this transaction.

12. The Combination Promissory Note, Security Agreement and Disclosures Required by Federal Law (hereinafter "the Combo form") utilized in the August 25, 1982, transaction indicated, by the checking of three boxes in the portion disclosing SECURITY, that the loan is secured by credit insurance proceeds, the Gursts' residence, and the Security Agreement. The SECURITY AGREEMENT portion, while not having any applicable boxes checked, has typed in a reference to security in the Home.

13. The Combo form utilized in the August 23, 1982, transaction, meanwhile, has only one box checked in the portion disclosing SECURITY in credit insurance proceeds. The SECURITY AGREEMENT portion is filed exactly as in the Combo form provided in the August 25, 1982, loan.

14. Mr. Peters conceded that "mistakes" were made in completion of the August 23, 1982, Combo form, particularly in failing to make any reference in the disclosure portion of the form to the security taken in the Home in SECURITY AGREEMENT portion of the Combo form. We find Mr. Peters' candor refreshingly accurate.

15. The "proceeds of loan(s) available to debtor(s)" in these transactions were

$4,840.25 (August 23, 1982, loan) and $4,694.88 (August 25, 1982, loan).

16. The payments, as best we can ascertain from records of the Creditor which are of doubtful legibility, totalled $4,311.67 on the August 25, 1982, loan, and $799.02 on the August 23, 1982, loan.[2]

17. On August 22, 1985, the Gursts, by their counsel, had hand-delivered to the Creditor (August 23, 1982, loan) and the Creditor's assignee (August 25, 1982, loan) letters indicating their desire to rescind each of these transactions. These letters stated that the Creditor was obliged to terminate its security interests in the Home and return the sums paid to the Gursts, upon receipt of which counsel indicated that the Gursts would be advised to tender their necessary performances.

18. On August 16, 1985, the Creditor responded to the letter sent to it by stating that it considered the notice of rescission to be "of no effect, invalid, and just a ridiculous pleading or action on your part."[3]

19. The Debtor commenced this action on March 20, 1987, in the form of a Complaint attacking the Creditor's two separate Secured Proofs of Claim in the amounts of $10,728.60 (Claim No. 1, based on the August 23, 1982, loan) and $5,225.48 (Claim No. 2, based on the August 25, 1982 loan).

20. Although filing a lengthy paragraph-by-paragraph Answer to the Complaint on April 24, 1987, the Creditor failed to raise the statute of limitations as an affirmative defense to any of the Debtor's claims.

## C. CONCLUSIONS OF LAW

■ 1. The Creditor's failure to properly disclose the security interest taken in the Home and to disclose at all the security interests retained in the 1974 Chevrolet auto and the 1977 Ford auto in the August 23, 1982, transaction, is a material violation of the then-applicable law and Regulations.[4] See former 15 U.S.C. § 1639(a)(8); 12 C.F.R. § 226.8(b)(5).

■ 2. The Creditor's disbursements of refunds to the borrowers prior to the expiration of the three-day rescission period in the August 25, 1982, transaction constitutes a material violation of the then-applicable law and Regulations. See former 12 C.F.R. § 226.9(c).

■ 3. Since the Gursts received no benefit, use, or advantage from the stream of loans involving Harvey and/or his wife Kimberly, and the Creditor had no reason to know that the Gursts would derive any benefit, use, or advantage therefrom, the Creditor did not allow the Gursts to "become obligated" to it in an amount in excess of $5,000.00. See former 7 P.S. § 6214 A; 10 PA.CODE § 41.3(o). Therefore, none of the loans in issue were usurious.

4. No other material violations of the TILA or its Regulations are chargeable to the Creditor. However, those violations enumerated in Conclusions of Law One and Two supra are each sufficient in themselves to allow both of the Gursts, including the Debtor, to rescind both of these transactions.

■ 5. As a consequence of the Gursts' valid rescission of these loans, the security interests taken in the Home are void, and they are not liable for any finance charges. See 15 U.S.C. § 1635(b); former 12 C.F.R. § 226.9(d).

■ 6. The Creditor's failure to perform its requisite obligations authorizes the Gursts to retain possession of the loan proceeds, and hence eliminates their obligation to repay the Creditor at all. See id.

2. In light of our disposition that the entire loan balances must be cancelled, these figures are not significant enough to cause us to request the parties to address themselves to the issue of what they actually *do* set forth.

3. The letter goes on to state that "the entire concept upon which your letter is based, ... is ridiculous and an outright lie." Such exchanges did little but exacerbate the extended conflicts between the parties.

4. The applicable law is the form of the TILA and Regulations in effect prior to October 1, 1982. See P.L. No. 96–221, § 625 (1980), *as amended,* P.L. No. 97–25, § 301 (1981). *See, e.g., In re Johnson–Allen,* 67 B.R. 968, 970 (Bankr.E.D.Pa.1986).

7. The Debtor is also entitled to recover statutory damages because of the Creditor's failure to properly respond to his rescission request. It does not appear that he demanded any other damages. Although his failure to bring this action within one year from the date that refusal to honor the rescission, occurring on or about September 2, 1985, would be fatal had the Creditor raised limitations as an affirmative defense, its failure to do so waived this defense.

## D. DISCUSSION

### 1. THE CREDITOR'S DISBURSEMENT OF THE PROCEEDS OF THE AUGUST 25, 1982, LOAN PRIOR TO THE RESCISSION DATE CONSTITUTES A MATERIAL TILA VIOLATION

As we indicated at Findings of Fact 10 *supra,* both the credible testimony of Margot Gurst and a close review of the documents in issue establishes, beyond a doubt that, in the August 25, 1982, transaction, the Creditor disbursed the proceeds of same to the Gursts prior to the expiration of the rescission period. The following response of the Creditor on this point is characteristically loaded with bombast but empty of content:

> The debtor's counsel takes issue of the fact that the lender prepared checks on the date of the loan transactions. Note should be taken that this issue was not raised in the rescission letters P–35 and P–27. However, there was not a scintilla of evidence that the lender disbursed funds to the debtor. The preparation of checks is not a violation warranting rescission. *Clontz, Jr. Truth in Lending Manual,* Vol. 1. 6–51, 6–52 (1982), App. A attached hereto; Regulation Z, Sec. 226.-23(c).

With respect to the August 25, 1982, transaction, the Debtor is not merely *arguing* that the checks were *prepared* on the date of the loan, prior to the termination of the rescission period, but, contrary to the Creditor's assertion that not a scintilla of evidence of disbursement on the date of the loan appears, has *proven,* almost beyond any doubt, by producing the cancelled checks, that the funds were *disbursed* on that date. Professor Clontz, in the 1 TRUTH–IN–LENDING MANUAL 6–51, cited by the Creditor, thusly reiterates that, while drawing the check prior to the rescission date is permissible, disbursement of funds, other than in escrow, is strictly prohibited:

> Under Rev.Reg. Z § 226.23(c), unless a consumer waives the right of rescission as allowed under Rev.Reg. Z § 226.23(e),
>> no money shall be disbursed other than in escrow, no services shall be performed, and no materials shall be delivered,
>
> until the rescission period has expired and the creditor is reasonably satisfied that the consumer has not rescinded.[5]

The pertinent former Regulation on this point, 12 C.F.R. § 226.9(d), reads as follows:

> (d) Effect of rescission. When a customer exercises his right to rescind under paragraph (a) of this section, he is not liable for any finance or other charge, and any security interest becomes void upon such a rescission. Within 10 days after receipt of a notice of rescission, the creditor shall return to the customer any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created

---

**5.** The exception in paragraph (e) refers to situations where the customer waives the right of rescission, due to the need for funds for an emergency. Although Margot Gurst, to the apparent surprise of her counsel, testified that, in the fourth loan in the stream of transactions, the purpose for which she and her husband received the proceeds *was* an emergency, there is no evidence and no contention that either of the August, 1982, loans were for emergencies. The candor of Mrs. Gurst's testimony against her apparent interests as to the fourth loan enhances our belief in her credibility generally.

under the transaction. If the creditor has delivered any property to the customer, the customer may retain possession of it. Upon the performance of the creditor's obligation under this section, the customer shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the customer shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the customer, at the option of the customer. If the creditor does not take possession of the property within 10 days after tender by the customer, ownership of the property vests in the customer without obligation on his part to pay for it.

As the Clontz text quoted above indicates, the substance of former 12 C.F.R. § 226.-9(d) is carried over in the present 12 C.F.R. § 226.23(c). Thus, this provision continues to be an important aspect of a borrower's right of rescission under the TILA.

The most articulate explanation of the purposes behind these Regulations known to us is thusly expressed by Judge Newcomer of our District Court in *Curry v. Fidelity Consumer Discount Co.*, 656 F.Supp. 1129, 1131 (E.D.Pa.1987):

> As this court noted in *Laubach v. Fidelity Consumer Discount Company*, No. 85–1902 (April 9, 1986) [Available on WESTLAW, DCTU database], two purposes underlie the statutory rescission period:
>
> > "First, it allows the consumer an opportunity to reflect, in the quiet of her home and without any pressure, whether to undertake a loan transaction which would create an encumbrance on the home. Second, it insures that if the consumer decides to cancel, she will not be without the ability to do so (i.e., she cannot spend the loan proceeds). *Rudisell v. Fifth Third Bank*, 622 F.2d 243, 249 n. 9 (6th Cir.1980)."
>
> *Laubach, supra,* slip op. at 9–10.

In addition to the *Rudisell* decision and his own prior unreported decision in *Laubach*, the holding of Judge Newcomer is supported by the decision of Judge Cahn of this Court in *Solis v. Fidelity Consumer*

*Discount Co.*, 58 B R. 983, 986 (E.D.Pa. 1986). *See also, e.g., Gerasta v. Hibernia Nat'l Bank*, 411 F.Supp. 176, 190 (E.D.La. 1975), *aff'd in pertinent part*, 575 F.2d 580 (5th Cir.1976).

We note that the instant case does not involve the nuances of *Curry* and *Laubach* because, there, the creditor negotiated checks which were post-dated to a date after the rescission date had passed. Under these circumstances, the creditor could at least plausibly contend that the transaction could be undone if the consumer effected a timely rescission. However, Judge Newcomer, in each case, found this explanation to be an unacceptable attempt to "circumvent" the pertinent Regulation. 656 F.Supp. at 1132. Here, as apparently in *Solis*, there was a bare-faced, indefensible violation of the Regulation.

The strongest evidence that the Creditor could point to in its favor was language stamped on the back of the check which "certified" that three days had passed before the check was negotiated. This self-serving language is belied by the date of the check and the stamped date of its negotiation. If anything, this "evidence" is even less convincing than the lender's argument in *Curry* and *Laubach* that the check was post-dated to prevent premature negotiation.

We agree with the implicit holding in *Curry, id.,* that such a violation of the Regulation in question is material and is hence in itself sufficient to allow the Debtor to rescind a transaction. For this reason alone, we must uphold the Debtor's right to rescind the August 25, 1982, transaction.

### 2. THE CREDITOR'S ADMITTED MISTAKES IN DISCLOSURE OF THE SECURITY INTERESTS TAKEN IN THE AUGUST 23, 1982, TRANSACTION CONSTITUTE A MATERIAL TILA VIOLATION

As Mr. Peters candidly admitted in his testimony, the Creditor, in completing the Combo form in the August 23, 1982, transaction, committed a gross violation of former 15 U.S.C. § 1639(a)(8) and 12 C.F.R. § 226.8(b)(5), which require a "description of any security interest" held by the credi-

tor and "a clear identification of the property to which the security interest relates."

We preface our instant discussion with the rather elementary observation that the Combo form must be considered as a triparite document, the top portion of which is the only portion properly designated as the disclosure form, the middle portion of which serves as what would otherwise be a separate Promissory Note, and the bottom portion of which serves as what would otherwise be a separate Security Agreement.

The keynote of the TILA disclosures is that they must accurately portray the rights which the creditor has obtained against the consumer in the credit transaction in issue. One important element of an accurate disclosure is a clear description of the Security interests taken by the Creditor *on the disclosure statement itself.* In the Security Agreement portion of the Combo form, the Creditor indicated, although in imperfect fashion due to its failure to check any of the applicable boxes, that it took a security interest in the Gursts' Home. A mortgage was also executed providing security in the Home. However, the disclosure portion of the Combo form indicates that the only security taken is the proceeds of the credit insurance. Not even the box indicating that the loan is also secured by the Security Agreement below, which arguably might incorporate the Security Agreement portion of the Combo form, is checked. *But see Gennuso v. Commercial Bank & Trust Co.,* 566 F.2d 437, 441–43 (3d Cir.1977); and *In re Martin,* 72 B.R. 126, 128–29 (Bankr.E.D.Pa.1987) (all disclosures, particularly that of the security interest taken by the creditor must appear together on the disclosure statement). Moreover, none of the boxes in the Security Agreement portion of the form are checked, putting the consumer reading it off guard that *any* security was taken.

The Creditor's counsel attempted to "impeach" Mr. Peters' concession that an error was made in completion of the disclosure statement portion of the form by contending that only security in the property of the "Debtor" himself (Harvey) was to be disclosed in the top portion of the form. This suggestion was, of course, nonsensical for a variety of reasons. First, it would not then allow for any disclosure of the security taken in the Gursts' Home anywhere in the disclosure statement portion of the form. Secondly, the failure to disclose that additional security is taken below in the Security Agreement renders the form internally inconsistent. Finally, as the Debtor's counsel pointed out, if the "Debtor" means only Harvey, the recitation above the parties' signatures that only the "Debtor" acknowledges receipt of a copy of the Combo form would constitute an admission that no copy was given to the Gursts. Clearly, then, Mr. Peters was accurate in his assessment that "mistakes" were made in filling out the form.

We also note that the security interests retained in Harvey's 1974 Chevrolet and the 1977 Ford auto titled in the name of Kimberly's father are not disclosed anywhere on the form. Mr. Peters rather reluctantly conceded that the Creditor retained security in the 1974 Chevrolet at the time of the August 23, 1982, transaction, and admission of a March 9, 1987, duplicate of the title of the 1977 Ford into evidence reveals that the Creditor *still* has a first lien on this vehicle. It is impossible to fathom the Creditor's argument that it did not "retain" this security simply because it now indicates that it really did not want it. The point is that it *had* such security, and it should have disclosed this, at least on those loans within the stream of transactions involving Harvey, wherein these liens were acquired.

The foregoing serious deficiencies in the August 23, 1982, loan papers are beyond a doubt less than a sufficient description of the security interests taken and are a most unclear identification of the security interests taken. These violations of 15 U.S.C. § 1639(a)(8) and 12 C.F.R. § 226.8(b)(5) are in themselves sufficiently material to justify rescission of the August 23, 1982, loan transaction.

3. THE DEBTOR'S OTHER ALLEGATIONS OF TILA VIOLATIONS AND HIS ALLEGED STATE USURY LAW VIOLATION MUST BE REJECTED

We do not believe that the other allegations of violations in these transactions are meritorious, although, in light of the fact that one material violation of the TILA is sufficient to trigger a rescission right, we

need explain our results only briefly. The contention that the Creditor improperly computed the rebates of finance charges and credit insurance, and consequently erred in its disclosures of the finance charged, the amounts financed, and the annual percentage rates because it considered partial months that the loans had run as full months in utilizing the applicable Rule of 78's table has already been rejected by us in *Jones, supra,* 79 B.R. at 237–238. The conflicting testimony of the Gursts and Mr. Peters causes us to have some doubts about the delivery of rescission notices and forms to the Gursts in the stream of loans involving Harvey. However, since we also find the Regulation purportedly requiring that each signatory receive copies somewhat less than clear, 12 C.F.R. § 226.6(e), we decline to make any ruling on this basis. Also, we reject the Debtor's contention that the Creditor here held and failed to disclose "multiple mortgages," as was found violative of the applicable Regulation in *Jones,* at 239–240; *Melvin,* 75 B.R. at 954–57; and *Tucker,* 74 B.R. at 928–31. The Debtor's argument is based upon the assertion that the security taken in the Gursts' own stream of loans must be disclosed in Harvey's stream of loans and vice-versa. We believe that each stream constituted an entirely separate set of transactions, which did not require cross-references or cross-disclosures.

We also agree with the Creditor's argument that the Debtor's usury claim and the TILA directly related to and dependent upon it lack merit. The basis of the usury claim arises from 7 P.S. § 6214 A, the version of which was in effect in August, 1982, read as follows:

A. A licensee shall not permit any person to become obligated to such licensee as a consumer on one or more loan contracts for an aggregate amount in excess of five thousand dollars ($5,000.00), exclusive of charges authorized by this act. A husband and wife for the purposes of this limitation shall be construed as one consumer. This limitation shall not apply to the purchase of contracts which arise from the bona fide sale of goods or services by a seller regularly engaged in the sale of such goods or services. This limitation shall not impair the authority of a licensee to lend money, credit, goods or things in action, or to purchase contracts in amounts in excess of five thousand dollars ($5,000.00) and charge, contract for, receive or collect interest or discount at the legal rate established by the General Usury Statute of the Commonwealth.

The Debtor accurately cites *Beneficial Consumer Discount Co. v. Whitesell,* 45 Pa.Cmwlth. 156, 404 A.2d 794 (1979), for the principle that the maximum finance charge allowable under the CDCA on any loan the aggregate of which exceeded five thousand ($5,000.00) dollars was the CDCA rate on the amount up to five thousand ($5,000.00) dollars and the legal rate of six (6%) percent on that portion of the proceeds in excess of five thousand ($5,000.00) dollars.

However, the Debtor's claim on this score is dependent upon his classification as a "person ... obligated ... on one or more loan contracts" as to the stream of loans involving Harvey as well as those involving only Margot and himself. This contention, we believe, overlooks the impact of 10 PA.CODE § 41.3(*o*), which provides as follows:

(*o*) For the purposes of this subsection, an individual signing the face of a joint note shall, in the absence of specific designation to the contrary, be construed as being liable as maker. *When a licensee knows or has reason to know that an individual consumer derives the use, benefit, or advantage of an aggregate amount in excess of $5,000 from the proceeds of one or more separate loan contracts granted by a licensee directly to the consumer or indirectly through other consumers, the loan contracts shall be construed as a single loan contract in excess of $5,000,* and interest on the amount in excess of $5,000 shall be limited to the legal rate established by the act of January 30, 1974 (P.L. 13, No. 6) (41 P.S. § 202), which rate is 6.0% *per annum* simple interest. This limitation does not apply to the purchase of installment sale contracts or home improvement contracts, or another loan granted under another statute of the Commonwealth (emphasis added).

The reasoning of the *Whitesell* case is based upon several premises. One is that, in such a complex area as banking and finance, the Department of Banking must

be accorded great deference in its interpretation of ambiguous statutory language. The other is that this particular statutory provision, 7 P.S. § 6214 A, should be read in such a way as not to encourage consumers to patronize multiple loan companies to fulfill their lending needs.

We decline to accept the Debtor's implicit assumption that the words "to become obligated" on a CDCA loan unambiguously equate an obligation as a principal maker with that of a co-signer. Finding 7 P.S. § 6214 A ambiguous on this point, we turn to the interpretive guidance of 10 PA. CODE § 41.3(o). There, we find the touchstone of determination of whether the borrower is "liable" or "obligated" to be whether the lender "knows or has reason to know" that an individual consumer "derives the use, benefit, or advantage of an amount in excess of five thousand ($5,000.00) dollars."

In the pertinent stream of loans involving Harvey, it is clear that Harvey (and Kimberly perhaps) obtained the exclusive "use, benefit, or advantage" of the loan proceeds to finance an automobile. His parents, including the Debtor, derived nothing but heartache and an unneeded addition to their already overwhelming financial burdens in co-signing on these loans. The Creditor, clearly and correctly, knew that the Debtor and his wife did not receive the "use, benefit, or advantage" of these proceeds.

We therefore believe that 10 PA. CODE § 41.03(o) exempts the stream of loans involving Harvey from being considered as a loan to the Debtor for purposes of 7 P.S. § 6214 A.[6] This result serves the end of discouraging parties situated like the Gursts from being compelled to sponsor their children's loans at multiple loan companies, and allowing them to sponsor loans for their children with companies with which they are familiar. We find nothing inequitable in this aspect of the Creditor's dealings with the Gurst family. We there-

fore do not hesitate to exonerate the Creditor from the Debtor's claims of usury. The Debtor's calculations of the usurious interest charged, based on the assumption that any excess of the amount of five thousand ($5,000.00) dollars in both streams of loans could be aggregated, is thus for naught. Falling with this claim is also the Debtor's extended argument that a charge of usurious interest constitutes a violation of the TILA.[7]

### 4. THE CREDITOR'S FAILURE TO PROPERLY RECOGNIZE THE DEBTOR'S VALID RESCISSIONS SUBJECTS IT TO SEVERAL PENALTIES

Despite our rejection of his usury claim and the significant financial windfall that this would bring the Debtor, the benefits flowing to him from his valid rescission of the two loan transactions of August, 1982, and the Lender's refusal to accept these valid rescissions, are not inconsiderable, as in *Tucker, supra,* 74 B.R. at 923–33. Clearly, as per 15 U.S.C. § 1635(b) and 12 C.F.R. § 226.9(d), the security interests taken by the Creditor, i.e., the mortgages on the Home, are void. For indigent persons involved in a no-asset bankruptcy, such as both of the Gursts, this benefit alone is tremendous, because the Creditor's claim becomes entirely unsecured and its liquidation with no or a nominal payment is almost an inevitable consequence.

The pertinent statute and Regulation, however, also expressly eliminate any obligation of the Debtor to pay any finance or charges other than the net proceeds of the loans in issue. The net proceeds of the loans to the borrowers were $4,840.25 and $4,694.88 on the August 23, 1982, loan and the August 25, 1982, loan, respectively. The payments made on the loans can only be ascertained by deciphering less than totally legible payment records of the Creditor admitted into the record among the raft of tendered documents. The Debtor suggests that these records support findings

---

6. We observe that the Debtor, while submitting a thoughtful Reply Brief on several issues, including the statute of limitations issue, is uncharacteristically silent in rebuttal of the Creditor's arguments based on 10 PA.CODE § 41.3(o). This suggests that no rebuttal on this point can be delivered.

7. We totally reject the Creditor's attempt to assert a "bona fide error" defense, per 15 U.S.C. § 1640(c), as to any of the violations asserted, as the errors appear to us to be more than simple clerical mathematical mistakes and the Creditor has totally failed to establish the "maintenance of procedures reasonably adapted to avoid such errors." *See, e.g., Thomka v. A.Z. Chevrolet, Inc.,* 619 F.2d 246, 250–51 (3d Cir.1980).

that $3,993.63 was paid on the Gursts' own loan and $978.52 was paid on that of Harvey. However, our inspection yields the conclusion that $4,311.67 was paid on the Gursts' own loan and but $799.02 on that of Harvey.

We shall not, however, dwell on these calculations because our ultimate conclusion is that the Debtor's obligation to the Creditor is eliminated entirely by its failure to properly respond to the Debtor's request to rescind these transactions. As we pointed out in *Tucker, supra,* 74 B.R. at 933, the language of 15 U.S.C. § 1635(b), reiterated in 12 C.F.R. § 226.9(d), could very easily support an order requiring the Creditor to *both* return the payments made to it by the Debtor *and* allow the Debtor to vest ownership in the property given to him, i.e., the loan proceeds, in himself. However, we also indicated, in that same passage, that we would consider the relative equities of the parties in determining whether to visit the full force of these consequences against a lender.

Here, although we found clear, material violations of the TILA present, which should have prompted the Creditor to accept the Debtor's rescission and probably thereby avoid the years of multiple litigation which have been invested in the Gurst family disputes with this Creditor, we do not perceive a pervasive effort to deceive or cheat the Debtor and his family by the Creditor. Such elements as excessive "flipping," *see Tucker,* 74 B.R. at 926–27, or "dragging the body," *see In re Laubach,* 77 B.R. 483, 484 (Bankr.E.D.Pa.1987), the latter of which appears to have been present in *Curry, Laubach,* and *Solis, supra,* are absent here. Near the close of the hearing, the Debtor stated that he continued to believe that Mr. Peters was "a helluva nice guy," which in our view negates any subjective impression on the Debtor's part that the Creditor had intentionally mistreated him or his family.

However, here, unlike as in *Tucker,* 74 B.R. at 933, the Debtor has demanded the full panoply of remedies available to him under 15 U.S.C. § 1635(b) and 12 C.F.R. § 226.9(d). Following the example of District Judge Charles R. Weiner in *Gill v. Mid–Penn Consumer Discount Co.,* 671 F.Supp. 1021, 1026–27 (E.D.Pa.1987), we shall confine the Debtor's remedy here to excusing him from repayment of the outstanding loan balances entirely. *See also, e.g., Arnold v. W.D.L. Investments, Inc.,* 703 F.2d 848, 853 (5th Cir.1983). It should be recalled that our decision, while it probably will result in the ultimate elimination of Margot's liability, will not affect that of Harvey and Kimberly on the loans involving them.

The Debtor also demands recoupment damages due to alleged TILA violations in the prior six loans. However, the elimination of the Debtor's liability eliminates any loan balance against which the Debtor may recoup. Also, we have previously held in *Melvin, supra,* 75 B.R. at 959–60, that recoupment cannot be claimed against loan obligations which have been extinguished in refinancing transactions.

A comedy of errors pervaded the Debtor's claim for statutory damages. Probably in recognition of 15 U.S.C. § 1640(e), which bars claims not made within a year of the TILA disclosure violation, the Debtor nowhere articulates, in his Complaint, a claim for such damages. He does make a claim for statutory damages, inexplicably in the amount of $3,000.00 in his Complaint, but even these would appear to be clearly barred by 15 U.S.C. § 1640(e), because the Debtor delayed until March, 1987, to commence this action, more than one year after the Creditor's separate violation of refusing to honor the Debtor's valid rights of rescission occurred, on or about September 2, 1985. However, nowhere in its Answer does the Creditor plead this defense, as Bankruptcy Rule 7008 and Federal Rule of Civil Procedure 8(c) clearly require. *See, e.g., Zelson v. Thomforde,* 412 F.2d 56, 59 n. 10 (3d Cir.1969); *IBEW, Local 5 v. United States EEOC,* 398 F.2d 248, 250 n. 4 (3d Cir.1968); and *VanSant v. American Express Co.,* 169 F.2d 355, 372 (3d Cir.1948). *Cf. In re American International Airways, Inc.,* 77 B.R. 490, 492 n. 1 (Bankr.E.D.Pa.1987) (res judicata waived if not raised as an affirmative defense). Therefore, the net result is that the Debtor is entitled to $2,000.00 statutory damages, for the failure of the Creditor to properly rescind either of the two transactions in issue.

### 5. OUR DECISIONS HERE IMPACTS ON THE OTHER OUTSTANDING MATTERS INVOLVING THESE PARTIES

As we anticipated in our prior decision in this case, our decision here renders inevitable the disposition of the Creditor's Motions (1) for relief from the automatic stay in the Debtor's main case and (2) to remand the 1983 mortgage foreclosure action instituted against the Debtor, Margot, Harvey, and Kimberly, concerning the loan stream involving Harvey, to the state court, in Adversary No. 86–1150S in this Court. The elimination of any valid claim of the Creditor against the Debtor requires us to deny the stay-relief motion. Similarly, the Debtor must be excised as a party from the removed foreclosure action, leaving as the remains of that case a foreclosure action against three non-debtors, Margot (not a debtor in this case),[8] Harvey, and Kimberly. It therefore appears that the removed action is no longer related to this case and should be remanded to the state court. *See In re Malone,* 74 B.R. 315, 318–20 (Bankr. E.D.Pa.1987). Newly-enacted Bankruptcy Rule 9027(e) requires that this Court file only a report and recommendation for disposition of this motion with the district court, allowing the parties ten (10) days in which to file Objections thereto.

An Order consistent with the Conclusions set forth in this Opinion shall be entered by us.

### ORDER

AND NOW, this 20th day of November, 1987, after trial of Adversary No. 87–0277S on July 8, 1987, and consideration of the respective Briefs of the parties herein and the Motions of PHILADELPHIA CONSUMER DISCOUNT COMPANY (hereinafter referred to as "the Creditor") for relief from the automatic stay and to remand the matter instituted in the Philadelphia Court of Common Pleas, at July Term, 1983, No. 4533, removed by the Debtor to this Court in Adversary No. 86–1150K above-captioned, in light of our disposition herein, it is hereby ORDERED as follows:

1. Judgment is entered in favor of the Plaintiff–Debtor, SHELDON GURST, and against the Defendant, PHILADELPHIA CONSUMER DISCOUNT COMPANY (hereinafter referred to as "the Creditor") as to certain of the claims set forth in Adversary No. 87–0277S, as described in the foregoing Opinion and the subsequent paragraphs of this Order.

2. The Claim of the Creditor against the Debtor is invalidated in its entirety.

3. The Creditor shall satisfy, as to him, the mortgages which it has taken against the Debtor's residential real estate at 11732 Millbrook Road, Philadelphia, Pennsylvania 19154, within ten (10) days from the date of this Order.

4. The Creditor shall pay the sum of $2,000.00 to the Standing Chapter 13 Trustee, Edward Sparkman, Esquire, as damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(i). The said Trustee shall determine whether this sum may be claimed as part of the Debtor's exemptions, and, if it may be, he shall forward this sum to the Debtor forthwith.

5. The parties are urged to attempt to agree upon reasonable attorney's fees and costs which are due to the Debtor's Counsel, per 15 U.S.C. § 1640(a)(3). If this matter is not resolved within fifteen (15) days, the Debtor's Counsel shall, within thirty (30) days of this Order, file a Motion requesting such fees, said Motion to be procedurally in conformity with *In re Meade Land and Development Co., Inc.,* 527 F.2d 280 (3d Cir.1975). However, if the Debtor's Counsel remits a reasonable request for such fees, which if refused, the said Counsel may recover compensation for time spent on the fee application as well.

6. In light of this disposition, the Creditor's Motion for relief from the automatic stay arising from the Debtor's bankruptcy filing, per 11 U.S.C. § 362(a), is DENIED.

7. Judgment is entered in favor of the Debtor only, and against the Creditor, in Adversary No. 86–01150S.

---

**8.** We must admit that we are unable to understand why no affirmative action such as Adv. No. 87–0277S was ever instituted on behalf of Margot. Although it seems clear that she should be dismissed from the state court action under principles of collateral estoppel, we do not believe that we have jurisdiction to do so in light of the connection of Adv. No. 86–1150S to the case of the instant Debtor only.

8. In light of our disposition set forth in paragraph seven of this Order, it is hereby RECOMMENDED that the District Court order that the Motion of the Creditor to remand the remaining aspects of Adversary No. 86–1150S to the Court of Common Pleas of Philadelphia County, at July Term, 1983, No. 4533, be GRANTED and that the said action may proceed against Defendants MARGOT GURST, HARVEY GURST, and KIMBERLY GURST only in that court.

9. The Deputy in Charge of Bankruptcy Operations is directed to transmit this Recommendation and the accompanying Opinion to the District Court.